# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2576

LOUIS V. NESE,

*Plaintiff-Appellant*,

v.

JULIAN NORDIC CONSTRUCTION
COMPANY and ADMINISTAFF,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 5839—**John W. Darrah**, *Judge.*

———————

ARGUED FEBRUARY 8, 2005—DECIDED APRIL 27, 2005

———————

Before RIPPLE, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Louis Nese claims that his em-
ployer violated the Americans with Disabilities Act, 42 U.S.C.
§ 12101 (ADA), by reducing his wages and then terminating
him because of its incorrect perception that he had a
disability. The district court granted summary judgment for
the employer and Nese appeals.

Nese, who is now in his forties, began having epileptic
seizures when he was 15 years old. He has taken prescrip-

tion medication to control his seizures for about 27 years. He experiences no side effects from the medication and has regularly worked as a carpenter for various employers, including Handy Andy and Builders Square. He has also run a company of his own, though it apparently was not profitable. The defendant, Julian and Nordic Industries, Inc. (that's the name we find in one brief—the other says Nordic Construction Services, Inc.), which we will refer to as Nordic, is a general contractor providing commercial and residential services and fire and water damage restoration. Administaff is a professional personnel management company, providing services to Nordic.

Prior to Nese's employment with Nordic and while he ran his own business, he was a member of the Downers Grove (Illinois) Chamber of Commerce and of a business networking group called the Lodge. Only one construction contractor was allowed to be a member of the Lodge. Nese held that membership. Also, though, Tom Julian, the owner of Nordic, was a member of the Lodge in his capacity not as a contractor, but as the owner of a cleaning service. The two men were acquainted and, in fact, it appears that Julian was instrumental in obtaining Nese's membership in the Lodge. The two men also assisted each other in generating business.

In August 2000, Julian hired Nese to work for Nordic on a 90-day trial basis. Nese informed Julian that he did not have a driver's license at that time because he had suffered a seizure. Nevertheless, Julian hired him and provided another employee to drive Nese to work until he was able to regain his driver's license. Nese's hourly rate of pay was $22.50 per hour.

However, in February 2001, Nese's hourly rate was reduced to $18.00 per hour. The controversy between the parties arises at this point. The wage rate was changed either because Nese's work pace was not up to the standard of the

other carpenters or because other workers were making less and the disparity was causing a problem. There is a controversy also over whether any Nordic employee had talked to Nese about problems with his work. When Nese's hourly rate was decreased, Julian completed an employee status change form which, at that time, did not contain any comments regarding the pace of his work. At some time, however, the form was amended and a comment was added that Nese's "[w]ork pace is not to standards of peers."

As to the pace of his work, Nese contends that it "may not have been exactly" like that of the other workers, but it was comparable. His supervisor, Gary Boerma, asked Nese and other carpenters to pick up the pace. Then in September 2001, Boerma completed a performance evaluation of Nese. The evaluation, in its present form, has a section covered with "white-out." Nese says the white-out was not there when he first saw the evaluation. Boerma says it was and that it covered a comment that another Nordic employee found unprofessional. The original comment was, "Louis has worked for himself for a long time and has apparently never had to shift gears." After that comment was covered, Boerma wrote, "He needs to complete assigned task within acceptable time frame, also needs to learn new tasks and methods." A month later, Nese was given a raise to $18.50 per hour.

Then in November 2001, Nordic received a letter from a legal advocacy group acting on Nese's behalf. The letter accused Nordic of possible discriminatory acts relating to the company's treatment of Nese. In January 2002, Nese was transferred to the side of Nordic's business which did insurance repair work. Julian completed an employee status change form that documented the transfer. On the form, Julian wrote, "Pace of work is still a problem—smaller jobs will be better suited to gauge pace." A few weeks later, Nese was placed on temporary layoff due to lack of work. By October, Nese apparently felt that he had been fired.

Following the layoff, Nese worked fixing up a home and since May 2003 has worked for a company called One Stop Construction. He admits that he can perform carpentry work.

The basis of Nese's appeal is, of course, that in some manner Nordic lowered his wages and then terminated him because of his disability—epilepsy. He does not claim, however, that his epilepsy actually makes him disabled within the meaning of the ADA. His claim is that Nordic perceived him as disabled and then made adverse employment decisions because of that perception.

We review the grant of summary judgment *de novo. Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999). Summary judgment is appropriate if on the record as a whole "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

To establish disability discrimination, Nese must show that he is disabled within the meaning of the ADA, that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that he suffered from an adverse employment action because of his disability. *Byrne v. Board of Educ., School of West Allis-West Milwaukee*, 979 F.2d 560 (7th Cir. 1992). In order to establish his prima facie case that he is disabled, Nese can show either (1) that he has a physical or mental impairment that substantially limits him in one or more major life activities; (2) that he has a record of such an impairment; or (3) that the employer regarded him as having such an impairment. 42 U.S.C. § 12102(2). If his condition does not meet one of these categories even if he was terminated because of some medical condition, he is not disabled within the meaning of the Act. The ADA is not a general protection for medically afflicted persons. *Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051 (7th Cir. 1997). As

we said, Nese is contending not that he is actually disabled, but that Nordic regarded him as disabled. Under a "regarded as" claim, a plaintiff must prove that either: (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, nonlimiting impairment substantially limits a major life activity. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)); *see also* 29 C.F.R. § 1630.2(l). In other words, the employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *see also Peters v. City of Mauston*, 311 F.3d 835 (7th Cir. 2002).

If an ADA plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision. If the employer succeeds, then the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995) (applying the indirect method of proof to ADA cases).

Perhaps realizing that there is nothing in this record to show that epilepsy had anything to do with Nordic's actions, nor has it limited his ability to work, Nese contends that he should prevail at the summary judgment stage because evidence that Nordic was aware of his seizure disorder should be combined with the evidence that Nordic "concocted" a pretextual justification for the termination—that is, that his work pace was slow. He sees evidence of pretext in the fact that the evaluation form has a whited-out statement. Nese wants us to collapse the requirement for a prima facie case under *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973), with the requirement that a plaintiff show that the defendant's reason for the employment action was pretextual. Basically, the argument is that if the company's reason for the employment action was somehow less than straightforward, we can draw the conclusion that the company must necessarily have been acting out of its perception that Nese was disabled. Nese asks too much.

The source of the argument is a case from the Court of Appeals for the Sixth Circuit—*Ross v. Campbell Soup Co.*, 237 F.3d 701, 708 (2001). The court stated:

> Because, under the "regarded as" prong, Ross's prima facie showing that he is disabled turns upon the employer's state of mind and how it thought Ross's back condition affected his performance as an employee, evidence of the employer's state of mind that would ordinarily be used to prove motive or discriminatory intent may also be probative of Ross's status as a person with a disability as defined by the ADA. Thus, evidence that the company created a pretextual reason for Ross's firing may tend to prove that it regarded Ross as a disabled employee.

A later case from the same court may, however, reveal the limits of the *Ross* holding. In *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593 (2002), the court agreed with the *Ross* panel's sympathy for plaintiffs because of the steep challenge they face in proving that an employer regarded them as substantially limited in their ability to work. However, in upholding judgment for the employer, the *Cotter* court distinguished *Ross*: "In *Ross*, there was substantial evidence that the plaintiff's medical status significantly influenced his employer's decision to terminate him; here, the evidence is insubstantial, and certainly far less compelling than in *Ross*." The court concluded that Cotter did not offer sufficient evidence to support a conclusion by a rational trier of fact that he was disabled or regarded as disabled within

the meaning of the ADA. In other words, the court required some basis to support the leap from evidence of pretext to a conclusion that disability discrimination must have been afoot.

The *Ross* approach was soundly rejected by the Court of Appeals for the Tenth Circuit in *Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1165 (2002):

> Mr. Rakity interprets *Ross* to mean the issue of pretextually concealed discrimination and the issue of "regarded as" disabled should be treated as one and the same. This proposed modification of the *McDonnell Douglas* framework would open the protected class to individuals who neither have an actual disability nor can even present triable evidence their employer believed they have a disability. We do not think the Sixth Circuit intended such an interpretation, and if it did, we decline to follow it.

Like the Tenth Circuit, we also decline to follow *Ross*.

An employer is not guilty of discrimination every time it takes an employment action for one reason, but provides a different explanation to the employee. For example, perhaps the employer terminates an employee simply because her supervisor does not get along with her. That might not be a reason the employer wants to admit openly, so, instead, work deficiencies—real or imagined—are cited as the basis for the action. Even though we could wish such shenanigans never happened, we suspect they do, and they do not violate the employment laws unless, for instance, the real reason the supervisor dislikes the employee is based on some protected characteristic. That is why the employee must first establish that she falls into a protected group before we look at either real reasons or pretextual ones for the employment action. In other words, to say the employer was less than perfectly frank does not prove that the employer acted as it did for discriminatory reasons.

We will examine Nese's claim in the same manner that we have long examined all such claims. Nese is an epeliptic. A medical condition, however, by itself does not constitute a disability under the statute. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002); *Krocka v. City of Chicago*, 203 F.3d 507 (7th Cir. 2000); *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944 (7th Cir. 2000). To show that he was disabled under the ADA, Nese must show that Nordic was aware of his impairment (which it was) and that Nordic believed that he was substantially limited in a major life activity (in this case, working) because of the impairment. *Skorup v. Modern Door Corp.*, 153 F.3d 512 (7th Cir. 1998). Nordic must have believed Nese was unable to work in a particular class or broad range of jobs. With respect to the major life activity of work, as we noted in *Moore*, the standards applicable to an actual disability apply as well to a perceived disability. Section 12102(2) looks beyond the plaintiff's inability to satisfy one employer. To be a substantial limitation on his ability to work, the limitation "must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA." *Skorup*, 153 F.3d at 515. There simply is no evidence in this record that under this standard Nordic perceived Nese as disabled. In fact, Nese was hired even though he told Julian that he could not drive at that time because he had suffered a seizure. Also, as an aside, we will mention that the same person who hired Nese is the one who fired him. In that situation, we have said that it is unlikely that discrimination is involved. The conclusion is based on a common-sense psychological assumption, that "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." [Citations omitted.] *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 745 (7th Cir. 1999).

Finally, the evidence of pretext is itself thin. The claim is, in part, that the statement "Louis has worked for himself

for a long time and has apparently never had to shift gears" was covered up and the statement "He needs to complete assigned task within acceptable time frame, also needs to learn new tasks and methods" was substituted. We are at a loss to understand how the former statement reveals discrimination or, in fact, how it is significantly different from the latter. The comment that Nese had no ability to shift gears can be interpreted as saying he needed to learn new tasks, etc. The fact that he worked for himself might also be seen as a reason that he did not complete tasks in a time frame acceptable to Nordic. Nothing indicates a belief that the reason Nese's work was not quite up to par was that he was disabled and unable to perform a broad range of jobs.

For these reasons, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
***Clerk of the United States Court of Appeals for the Seventh Circuit***