**Gregory PATMYTHES, Plaintiff,**

v.

**THE CITY OF JANESVILLE,
Defendant.**

No. 04–C–367–C.

United States District Court,

W.D. Wisconsin.

June 15, 2005.

Gregory Patmythes, pro se.

Gregg J. Gunta, Gunta & Reak, S.C., Milwaukee, WI, for Defendant.

OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary and declaratory relief in which plaintiff Gregory Patmythes, who is proceeding pro se,

contends that defendant City of Janesville violated the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 794, by eliminating his position because of the health care costs related to his cystic fibrosis. This case is before the court on defendant's motion for summary judgment. Jurisdiction is present. 28 U.S.C. § 1331.

Plaintiff suffers from cystic fibrosis, a potentially life threatening disease requiring extensive medical care. By all accounts, he served loyally and competently as defendant's permit coordinator for several years during which time defendant made accommodations for his illness. However, faced with budget constraints, defendant decided to terminate plaintiff's position and shift his responsibilities to other employees. Plaintiff theorizes that his position was selected for termination because of the health care costs associated with his cystic fibrosis. Defendant contends that plaintiff's position was selected because his duties could be most easily absorbed by other employees with the least disruption to the provision of services to its citizens.

Although plaintiff's theory is reasonable in the abstract, prevailing in a civil action requires evidence that permits a reasonable inference of discrimination without resort to speculation and conjecture. Plaintiff cannot prevail under either the direct or indirect method of proof available to ADA claimants. His claim fails under the direct method because his evidence is too speculative to support a reasonable inference of discrimination. As for the indirect method, plaintiff has presented no evidence from which a reasonable jury could infer that defendant's stated reasons for his termination were pretextual. Accordingly, I will grant defendant's motion for summary judgment.

Before setting out the undisputed facts in this case, two comments regarding the proposed findings of fact must be made. First, in responding to many of defendant's proposed findings of fact, plaintiff attempts to put the fact proposed into dispute by citing his own affidavit without identifying a particular paragraph or set of paragraphs. As defendant correctly observes in its reply brief, the court's summary judgment procedures require a litigant to identify the page or paragraph number of the portion of the affidavit on which he relies. *Procedure to be Followed on Motions for Summary Judgment*, I.C.l.e. Because plaintiff is proceeding pro se, the mistake relates to a single affidavit and the body of the affidavit is not particularly long, I have reviewed the content of plaintiff's entire affidavit and determined that it does not support most of the factual propositions and disputes for which plaintiff has cited it. Thus, nearly all of defendant's proposed findings of fact remain undisputed.

■ Second, defendant has submitted a new set of factual proposals with its reply materials. This too violates the court's procedures. Moving parties have an opportunity to propose facts when they submit their motions and non-moving parties may submit additional proposed findings of fact with their responses to the movant's proposals. However, allowing additional proposed findings after that time threatens to suspend indefinitely the court's ability to render a decision on the motion because each party must have an opportunity to respond to proposed factual findings. Thus, this court's procedures do not permit parties to submit new proposed findings with their reply briefs. Because the proper response to a party's failure to comply with a district court's summary judgment procedures is to disregard the nonconforming submissions, *Ziliak v. As-*

*traZeneca LP,* 324 F.3d 518 (7th Cir.2003), I have not considered the proposed additional findings defendant submitted with its reply.

From the parties' proposed findings of fact, I find that the following are material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Gregory Patmythes, a Wisconsin resident, has cystic fibrosis, a genetic disease that causes the body to produce an abnormally thick, sticky mucus that clogs the lungs and can lead to life-threatening lung infections. These thick secretions also obstruct the pancreas, preventing digestive enzymes from reaching the intestines to help break down and absorb food. Symptoms include salty-tasting skin, persistent coughing, wheezing or shortness of breath and excessive appetite but poor weight gain. The treatment of cystic fibrosis depends upon the stage of the disease and the organs involved and may include various medications and vigorous clapping on the back and chest to clear mucus from the lungs. Plaintiff was first diagnosed with the disease in 1972 and has suffered from it continuously since that time.

Defendant City of Janesville is a Wisconsin governmental entity located in Rock County. Under defendant's council-manager form of government, the city manager has the sole authority to create and eliminate positions and a fiduciary obligation to manage public financial resources in a cost-effective manner. Defendant has local tax rates that are lower than many of its peer communities and one of the lowest staffing per capita rates in the state.

Defendant employed plaintiff as a permit coordinator from March 1, 1999 until it eliminated the position on December 31, 2003. Defendant knew that plaintiff suffered from cystic fibrosis when it hired him; plaintiff had informed the chief building official and code administration department supervisor, Christine Wilson, and defendant's assistant director of human resources, Marie Gullickson, of his illness in the course of inquiring about how much coverage defendant's health care plan would provide for organ transplants. When plaintiff was hired, he elected to be part of defendant's self-funded health plan. Plaintiff did not have the required credentials to serve as the permit coordinator when he was hired but he acquired them during his tenure.

At one point during his employment with defendant, the building where plaintiff normally worked was undergoing some construction. Defendant granted plaintiff's request to have his office relocated outside the building to avoid the construction related dust. In addition, defendant accommodated plaintiff's doctors' request that a HEPA (High Efficiency Particulate Arrestance) filter be installed in plaintiff's work area. Defendant has never refused any of plaintiff's accommodation requests. In 2000, plaintiff was hospitalized because of his cystic fibrosis. At some point after returning to work from his hospitalization, defendant increased plaintiff's rate of pay. Plaintiff received nine other pay increases during the course of his employment with defendant.

### B. *2002 Budget Cuts*

In late 2001 or early 2002, defendant's city manager, Steve Sheiffer, learned of an impending state budget crisis. He became concerned that the state might reduce the shared revenue it had distributed among state municipalities in the past. In a January 14, 2002 city manager's staff meeting, Sheiffer asked those present for assistance in developing a contingency plan in the event state shared revenues were reduced. At the time, defendant was facing its own financial strain from significant increases

in wages, health insurance expenses and energy costs. On February 7, 2002, Sheiffer scheduled a meeting for all city employees. At the meeting, he informed the city employees that the governor had proposed to eliminate all municipal shared revenues and that if this proposal were implemented, it would have major negative consequences for defendant's financial situation.

Since 2002, defendant has been involved in an ongoing process to evaluate its organizational structure, staffing needs and internal processes of its codes and planning departments. Defendant's stated goal for these evaluations is to improve customer satisfaction and cost effectiveness. In a report and recommendation dated February 18, 2002, Sheiffer proposed that the city combine its code department with its housing and neighborhood services department to create the Department of Housing, Building and Neighborhood Services. Sheiffer believed that this reorganization would improve the quality the services delivered and employee productivity and reduce future costs by eliminating duplication of services and reduce administrative overhead. On February 25, 2002, defendant's city council approved the reorganization plan Sheiffer had laid out in his report. Before the reorganization, plaintiff's position was part of the code department. In June 2002, Sheiffer distributed a memorandum to defendant's employees entitled "Manager's Notes," wherein he informed them that defendant's cost reduction plan included a 5% spending reduction and allowing vacant staff positions to remain unfilled.

### C. 2003 Budget Cuts

In early 2003, Wisconsin Governor James Doyle submitted a budget to the Wisconsin State Legislature that reduced defendant's 2004 fiscal year shared revenues by $1,055,602. Sheiffer concluded that it was in defendant's best interest to proceed with the budget reduction plan on the assumption that defendant would indeed suffer this loss in shared revenue, which would account for 3% of all of defendant's budgeted 2003 general fund revenue.

During February and early March 2003, Sheiffer worked with defendant's finance director to develop the budget reduction plan. Sheiffer's goal was to avoid making any cuts to citizen services. Accordingly, he concluded that the most appropriate response to the 3% budget reduction would be to eliminate 3% of the general fund employment positions; he hoped that the remaining employees would be able to work more efficiently to pick-up the slack. Sheiffer determined that a 3% cut in staffing would require the elimination of a position in the Department of Building, Housing and Neighborhood Services. After considering the nature of each position in that department, including the services each provides, the benefit to and impact upon the citizens, department needs, service prioritization and various financial factors, Sheiffer and Jacob Winzenz, the head of the Department of Building, Housing and Neighborhood Services, decided to eliminate the position of permit coordinator. In their opinion, this position was not essential and its duties were most easily transferable to other employees.

At the time Sheiffer made his recommendation that the permit coordinator position be eliminated, he did not know that plaintiff suffered from cystic fibrosis or about the related health care costs. Sheiffer knew that plaintiff's work location had been moved during a building renovation project, but he did not know the reason for the move. Sheiffer never considered plaintiff's performance as permit coordinator in deciding to terminate his position. Winzenz knew that plaintiff suffered from cystic fibrosis and that he had taken time

off when he was hospitalized but did not know any specifics about plaintiff's health care costs or how they compared to those of other employees.

Shortly before Sheiffer and Winzenz made the decision to cut plaintiff's position, Christine Wilson, defendant's chief building official, returned from an extended family medical leave absence to care for her terminally ill husband. During her absence, some of her job assignments had been assumed by others; some of her responsibilities remained unperformed. Sheiffer and Winzenz determined that because some of her duties had already been shifted to other employees, Wilson would have time to assume some the responsibilities of the permit coordinator. Sheiffer and Winzenz did not consider cutting Wilson's position. The position of building official is required by city ordinance and its elimination would require action by the city council.

Winzenz did, however, consider eliminating one of the department's two property maintenance specialist positions. The second of the property maintenance specialist positions had been created in 2000 in response to a report presented to the city council regarding the need for more proactive enforcement of the housing and nuisance codes. At several city council meetings at which the report was discussed, residents expressed their concern about the lack of enforcement of these regulations. The total value of the compensation package for plaintiff's position was approximately $15,000 less than the value of the compensation package for the property maintenance specialist. In addition, Winzenz considered eliminating of one of defendant's two clerical staff positions. However, these two staff members are kept extremely busy answering phones, issuing building permits, and entering data into the computer. Winzenz concluded that these two clerical positions were criti-

cal to the effective functioning of the department.

Before 1997 the permit coordinator position was responsible for a greater range of responsibilities than in 1998 when defendant hired plaintiff. In 1997, the primary responsibility for reviewing building plans was shifted to the building inspectors although the permit coordinator retained responsibility to review plans for additions, alterations, accessory buildings, detached garages, swimming pools and fences. In addition, the permit coordinator retained responsibilities for the sign ordinance and other miscellaneous office functions. Each of the building inspector positions was critical for the operation of the department. Plaintiff had credentials to perform all building inspection duties.

On April 8, 2003, after explaining his proposals with the city division heads, Sheiffer submitted them to defendant's city council and presented them at a council meeting on April 12, 2003. The budget reduction plan eliminated 10.17 full-time equivalent positions in the areas of general government, public safety, public works, leisure services and community and economic development. At the time, all but two of the positions eliminated were vacant. The other employee whose position was eliminated was Dave Peters, who worked as a part-time aide in defendant's senior center. Plaintiff was not identified by name in Sheiffer's report. At the city council meeting, Sheiffer did not say that he eliminated the positions he did in the 2004 budget because it would have enabled him to save money on health care costs for the city.

In employee meetings in April 2003, Sheiffer outlined his plan to defendant's employees. He indicated that it was his goal to insure that there would be no nonperformance related layoffs. Sheiffer told the employees that so long as they were

doing a good job, they had no reason to worry. He made these comments even though he knew at the time that both plaintiff and Peters would be losing their jobs if the city council approved his plan. His purpose in doing so was to keep employees calm; he did not intend his statements to be a guarantee. On April 11, 2003, plaintiff met with Winzenz and defendant's assistant city manager, Tom Rogers. Winzenz told plaintiff that his job was being eliminated as part of the budget plan but that he would be allowed to stay on in the position of permit coordinator until December 31, 2003.

On November 24, 2003, defendant's common council adopted the 2004 budget which incorporated all aspects of the plan Sheiffer had submitted on April 8. The 2004 budget was approximately $1,010,080 less than the 2003 budget; defendant's state aid dropped by $1,179,550 for the fiscal year 2004. On December 3, 2003, plaintiff received a memorandum from Winzenz reminding plaintiff that his position would be eliminated effective December 31, 2003, as confirmed by the common council's adoption of the 2004 budget. Winzenz explained that as part of the budgeting process, the city administration had decided to eliminate one position in the building services department and, after careful consideration of the nature of each position, department needs and service prioritization, the administration had decided to eliminate plaintiff's position.

In 2003, defendant made a donation of $1,000,000 to the Janesville Performing Arts Center. The one million dollars consisted of $665,000 from defendant's general fund, $165,000 from a federal grant for community development and $170,000 from a tax increment financing fund. Neither the community development grant nor the tax increment funds could have been used to pay plaintiff's salary. Defendant had borrowed the $665,000 and was paying that loan back at approximately $79,840 each year. It was the city council's decision to make the donation to the Janesville Performing Arts Center.

(The parties dispute whether defendant has ever laid off any employees as a result of budget cuts in the past. Defendant points to the affidavit of Steve Sheiffer in which Sheiffer recounts four particular incidents, one in 1995, two in 1996 and one in 1997, all of which Sheiffer avers involved non-disabled employees. Plaintiff states in his own affidavit that during the hiring process, Marie Gullickson, an employee in defendant's human resources department, told him that defendant had never laid off any of its employees because of economic hardship. Because this statement was made by defendant's employee in the scope of her employment, it qualifies as an admission of a party opponent and therefore, is not inadmissible hearsay. Fed. R.Evid. 801(d)(2)(D) (a statement is not hearsay if "offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.").)

### D. *Health Care Study*

In February or March 2003, plaintiff learned from an email from defendant's human resources department that defendant was trying to analyze its health insurance issues. Defendant hired a consultant to analyze, prepare and present recommendations regarding the current state of health care provided to city employees. Defendant and its unions did not believe their best financial interest was served by doing business with two HMO's and operating its own self-insured plan as it had in the past. Defendant concluded that this piecemeal approach to providing coverage lead to higher overall fixed costs, difficulty collecting and analyzing consistent health care utilization information and complica-

tions working with multiple providers. In addition, defendant indicated that one of its goals was to encourage its employees to obtain health care within Rock County. The majority of plaintiff's medical care is provided by a cystic fibrosis care center outside the County. There are no cystic fibrosis care centers in Rock County.

At all relevant times, defendant maintained a self-funded medical and pharmaceutical plan administered by Midwest Security Administrators. While employed by defendant, plaintiff had elected to participate in defendant's self-funded plan instead of an HMO. The self-funded plan has a specific "stop loss" dollar limit for each plan participant. From the years 1998–2002, that specific "stop loss" limit was $50,000 for each covered person. In 2003–2004, the specific "stop loss" amount increased to $75,000. Midwest monitored the amounts incurred for each plan participant to determine whether a covered individual was approaching the stop loss amount. If an individual exceeds the stop loss amount, the remainder is covered under defendant's reinsurance coverage. Midwest's monitoring revealed that many covered individuals exceeded the specific stop loss amounts.

Defendant incurred the following costs relative to plaintiff's health care during his employment:

| Year | Medical | Dental | RX | TOTAL |
|---|---|---|---|---|
| 1999 | $ 2,701.90 | $ 62.40 | $ 0.00 | $ 2,764.30 |
| 2000 | $49,736.32 | $ 72.00 | $ 0.00 | $49,808.32 |
| 2001 | $34,041.22 | $ 72.00 | $33,268.28 | $67,381.50 |
| 2002 | $31,275.51 | $105.60 | $50,895.74 | $82,276.85 |

Plaintiff did not incur the highest total costs among all covered individuals in any of these years. Some of defendant's other employees suffer from chronic illnesses including cancer, heart disease and muscular dystrophy. Defendant has never terminated any employee because of the cost of their health care. Several of defendant's employees have been absent from work because of serious medical conditions that generated substantial health care costs.

### E. *Post Termination*

After his termination, plaintiff received continued health insurance coverage through defendant by making an election through the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161. Plaintiff applied for and obtained employment with UBC/Timber Roots in Middleton, Wisconsin. In his job application for UBC/Timber Roots, plaintiff indicated that his position with defendant had been "eliminated due to state budget." Plaintiff signed his employment application for UBC/Timber Roots, affirming that his answers to the questions in the application were true and correct and confirming his understanding that any false answers or deliberate omissions on the application may be grounds for rejection of the application and, if employed, for immediate discharge. Currently, plaintiff is employed by the City of Madison, Wisconsin as a zoning inspector. The permit coordinator position has not been reinstated since plaintiff's employment was terminated in December 2003. No one from defendant's human resources department ever told plaintiff that his cystic fibrosis disqualified him from performing his permit coordinator duties, could not be accommodated or was costing defendant too much in health care costs. Plaintiff filed a complaint with the Equal Employment Opportunity Commission and subsequently received a right to sue letter.

### OPINION

The ADA prohibits certain employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job train-

ing, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In enacting the Americans with Disabilities Act, Congress intended to level the playing field for disabled persons. *Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995). Although the Act provides disabled persons with a wide latitude of protection against discrimination, it "does not erect an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-á-vis the employee." *Id.*

■ The Rehabilitation Act of 1973 also prohibits discrimination against qualified employees on the basis of a disability by any program receiving federal financial assistance. 29 U.S.C. § 794a(a)(1). In the employment context, courts look to the standards applied under the Americans with Disabilities Act to determine whether a violation of the Rehabilitation Act has occurred. *Peters v. City of Mauston,* 311 F.3d 835, 842 (7th Cir.2002); *Silk v. City of Chicago,* 194 F.3d 788, 798 n. 7 (7th Cir.1999); *see also* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990"). Accordingly, I will address these claims together under the standards governing the ADA as the parties have done.

■ In order to prove disability discrimination under the ADA, plaintiff must show (1) that he is disabled within the meaning of the ADA; (2) that he is qualified to perform the essential functions of the job; and (3) that he suffered from an adverse employment action because of his disability. *Nese v. Julian Nordic Construction Co.,* 405 F.3d 638, 641 (7th Cir. 2005). Defendant concedes for the purpose of resolving this motion that plaintiff has submitted evidence from which a jury might find in his favor on the first two of these three prongs. Thus, this opinion addresses the question whether plaintiff has adduced evidence that would support a reasonable conclusion that defendant terminated plaintiff's employment because of his disability. In order to prove that defendant terminated his employment because of his disability, plaintiff may employ one of two methods of proof: direct or indirect.

## A. *Direct Method*

■ Under the direct method of proof, plaintiff may prove discrimination with either direct evidence or a convincing mosaic of circumstantial evidence. *Davis v. Con–Way Transportation Central Express, Inc.,* 368 F.3d 776, 783 (7th Cir. 2004); *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir.2004); *Rhodes v. Illinois Dept. of Transportation,* 359 F.3d 498, 504 (7th Cir.2004). "Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 616 (7th Cir.2000) (citing *Troupe v. May Department Stores, Co.,* 20 F.3d 734, 736 (7th Cir.1994)); *see also Lim v. Trustees of Indiana University,* 297 F.3d 575, 580 (7th Cir.2002) ("[D]irect evidence should prove the particular fact in question without reliance upon inference or presumption."). *But see Sanghvi v. St. Catherine's Hospital, Inc.,* 258 F.3d 570, 574 (7th Cir.2001) (noting disharmony in circuit cases; second line of cases holds that "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality") (citations omitted).

■ By contrast, circumstantial evidence is that which provides a basis for inferring intentional discrimination. *Troupe,* 20 F.3d at 736. "Circumstantial evidence comes generally in three flavors: (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that the employee was qualified for the promotion and passed over and the employer's reason for the difference in treatment is a pretext for discrimination." *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection,* 344 F.3d 680, 689–90 (7th Cir.2003) (citing *Troupe,* 20 F.3d at 736). Regardless of the form it takes, however, circumstantial evidence must "point directly to a discriminatory reason for the employer's action." *Adams v. Wal–Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir.2003).

Direct evidence is rare. Not surprisingly, plaintiff has none to support his claim. Instead, he attempts to prove his claims with the first two types of circumstantial evidence. Plaintiff lists the following as examples of suspicious timing and ambiguous statements: (1) the close proximity in time between the study on health insurance costs and defendant's decision to terminate plaintiff's position; (2) an "ambiguously ominous" comment made by Tom Rogers, defendant's assistant city manager, on September 7, 2001; (3) the $1,000,000 donation to the Janesville Performing Arts Center; (4) Sheiffer's comment that he would have made the same cuts in spending even if state aid had not been reduced; and (5) the fact that the permit coordinator's duties were not eliminated. As evidence that similarly situated employees were treated differently, plaintiff notes that defendant did not lay off any other employee in the Department of Housing, Building and Neighborhood Services.

The only proposed findings of fact relating to the comment by Rogers are contained in the set of proposals defendant submitted with its reply. As I have already explained, these facts are not properly before the court. Even if plaintiff had proposed facts about this incident, the nearly twenty-month time gap separating Roger's comment and the decision to eliminate the permit coordinator position undercuts any probative weight the comment might have had. *See, e.g., Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535 (7th Cir.2002) (alleged discriminatory statement not relevant because it was made 16 months before termination); *Conley v. Village of Bedford Park,* 215 F.3d 703, 711 (7th Cir.2000) (discriminatory statements made two years before failure to promote "too distant temporally to provide support"). Similarly, Sheiffer's supposed comment that he would have made the same cuts even if state aid had not been reduced is not referred to anywhere in the proposed findings of fact or responses. Thus, this statement cannot be considered. Even if plaintiff had proposed facts related to this comment, it would be of fairly little probative value. It is undisputed that defendant had its own financial problems aside from the state budget cuts as a result of increases in wages, health care costs and energy expenses.

■ As for the $1,000,000 donation to the Performing Arts Center and the fact that the permit coordinator duties have not been eliminated, neither supports an inference of discrimination. At best, both suggest that defendant's decision to eliminate plaintiff's job was a matter of discretion and not necessity. Defendant has never asserted that it had no choice in terminating plaintiff's position specifically. The relevant inquiry is not simply whether defendant had discretion or even whether defendant used its discretion wisely but

whether defendant used its discretion in a discriminatory manner. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1183 (7th Cir.2002). Asking a jury to infer discrimination from the mere fact that defendant could have allocated its resources differently is an invitation for speculation.

Plaintiff's contention that the fact that he was the only employee in his department to be terminated shows that similarly situated employees were treated differently is also unavailing. To prove substantial similarity in a reduction in force case, a plaintiff must show that he possessed "analogous attributes, experience, education, and qualifications relevant to the positions sought." *Radue*, 219 F.3d at 618. Thus, the court of appeals has recognized that evidence of different treatment of similarly situated individuals is rarely available when a single unique position is eliminated and the duties are dispersed among the remaining employees. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir.2000). Plaintiff has not submitted any evidence regarding the attributes, experience, education and other relevant qualifications of the other remaining employees in the Department of Housing, Building and Neighborhood Services and thus, has not shown that he was similarly situated to any of them.

That leaves plaintiff's sole evidence as the close proximity in time between defendant's study on health insurance costs and its decision to terminate plaintiff's position. Although suspicious timing qualifies as circumstantial evidence, a " 'temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause.' " *Buie*, 366 F.3d at 506 (quoting *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir.1999)). Unless the adverse employment action followed on the heels of the employer's discovery of the employee's dis-

ability, *King v. Preferred Technical Group*, 166 F.3d 887, 893 (7th Cir.1999), temporal proximity by itself "would not normally create an issue of material fact as to causation." *Buie*, 366 F.3d at 506.

In this case, defendant knew that plaintiff suffered from cystic fibrosis when it hired him. Plaintiff contends that there is a meaningful difference between knowing that a person has cystic fibrosis and gaining a full appreciation of the medical care that the disease requires. However, the facts show that before defendant hired him, plaintiff had inquired of the code administration department supervisor and the assistant director of human resources about how much coverage defendant's health care plan would provide for organ transplants. Whatever probative value the distinction plaintiff draws might have in another case, it is not relevant here. Defendant knew that plaintiff suffered from cystic fibrosis and it knew that the disease would entail serious and substantial medical care. Moreover, defendant has shown that plaintiff never incurred the highest annual health care costs; defendant retained other persons who suffer from chronic illnesses including cancer, heart disease and muscular dystrophy; and it has never terminated any employee because of the cost of their health care. Thus, the facts in this case reveal that the decision to terminate plaintiff's position did not follow closely on the heels of defendant's discovery of plaintiff's illness or immediately after defendant discovered that plaintiff was using health care resources vastly in excess of his co-workers.

Under the circumstances, plaintiff's temporal sequence evidence has little probative weight. By itself, it falls far short of creating a "convincing mosaic" of circumstantial evidence from which a reasonable inference of intentional discrimination might be drawn. Even if plaintiff had

mustered more compelling circumstantial evidence, the undisputed facts show that Sheiffer, the primary individual decision maker, did not know that plaintiff had cystic fibrosis until after he recommended the elimination of the permit coordinator position. As a simple matter of logic, "an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 932 (7th Cir.1995). Because plaintiff's evidence is insufficient to meet his burden of proof under the direct method, I will turn to the parties' arguments under the indirect method.

### B. *Indirect Method*

■■■ The indirect method allows for an inference of discrimination premised on a prima facie showing that plaintiff (1) was a member of a protected class; (2) was meeting his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) that similarly situated employees not in the protected class were treated differently. *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 530 (7th Cir.2003) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). This prima facie standard is modified in special cases, one of which is a "mini-RIF." *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 693 (7th Cir.2000). The term "mini-RIF" (reduction in force) refers to a situation in which a single employee is discharged and instead of being replaced, the terminated employee's job duties are absorbed by remaining employees. *Krchnavy v. Limagrain Genetics Corp.,* 294 F.3d 871, 876 (7th Cir.2002). "Because of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job, [the court of appeals has] dispensed with the requirement that the plaintiff show

'similarly situated' employees who were treated more favorably." *Michas,* 209 F.3d at 693. Instead, a plaintiff must show that "his duties were absorbed by employees who were not members of the protected class." *Id.; see also Bellaver v. Quanex Corp.,* 200 F.3d 485, 495 (7th Cir. 2000) ("The plaintiff in a single-discharge case does not need to make a showing that 'similarly situated' employees were treated better because the inference of discrimination arises from the fact that they were constructively 'replaced' by workers outside of the protected class.").

■■■ If a plaintiff satisfies all of these elements a presumption of discrimination arises and the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for its action. *Buie,* 366 F.3d at 503. Once an employer does so, the employee cannot succeed unless he shows by a preponderance of the evidence that the proffered reasons were pretext. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Pretext means more than just a decision made in error or in bad judgment; it means a lie or a phony reason for the action. *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.1996). "Although the burden of production shifts under [the indirect] method, 'the burden of persuasion rests at all times on the plaintiff.' " *Haywood,* 323 F.3d at 531 (quoting *Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280 (7th Cir.1985)).

■■■ Defendant appears to concede for the purpose of this motion that plaintiff has made out a prima facie case and focuses its efforts on demonstrating that it had a legitimate nondiscriminatory basis for eliminating the permit coordinator position. Defendant contends that it reduced its workforce in response to projected revenue shortfalls and that it selected plain-

tiff's position specifically because his duties could be most easily absorbed by other employees with the least disruption to the provision citizen services. Although plaintiff gives lip service to the well-settled rule that pretext cannot be shown with evidence revealing an employer's decision to be unwise, he makes exactly this sort of argument in attempting to establish pretext.

Plaintiff suggests that defendant could have saved more money by eliminating other positions in the Department of Housing, Building and Neighborhood Services without showing how the job duties of the other positions might be absorbed by the remaining employees. In making this argument, plaintiff targets Christine Wilson, defendant's chief building official, who had just returned from an extended family medical leave absence when defendant was determining which positions to eliminate. Plaintiff contends that defendant was under no obligation to allow Wilson to return to her position and that the department was able to function in her absence. Plaintiff's first assertion is flatly incorrect. Under the Family Medical Leave Act, 29 U.S.C. §§ 2601–2654, employees who take leave to provide care for a family member who has a serious health condition are entitled to be restored to the same position or an equivalent one when they return to work. 29 U.S.C. § 2614(a). It is unlawful for an employer to discharge an employee in retaliation for invoking her rights under FMLA. 29 U.S.C. § 2615(a)(2); *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 954 (7th Cir.2004). As for plaintiff's second point, the undisputed facts show that some of Wilson's responsibilities were not absorbed by other employees during her absence.

Plaintiff targets defendant's building inspector and second property maintenance specialist positions as ripe for termination. As for the second property maintenance

specialist, the record reveals that defendant's past experience had shown it that a single person performing those job duties was insufficient. At several city council meetings in 2000, Janesville residents had expressed their concern about the lack of enforcement of housing and nuisance codes. Plaintiff does not suggest that he or any of the other employees in the department were qualified to assume any of the property maintenance specialist job duties.

However, plaintiff does contend that he was qualified to perform the tasks of the building inspector. While this may be true, plaintiff cannot show that defendant's decision to have the building inspector assume plaintiff's duties as permit coordinator was discriminatory unless he can show that no reasonable person could have thought that the individual serving as defendant's building inspector was more qualified to assume both duties than plaintiff. *Millbrook*, 280 F.3d at 1180 ("where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the [other employee's] competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified") (citation and internal quotation marks omitted). As noted above, plaintiff has not provided any evidence of the attributes, experience, education and other qualifications of the individual serving as defendant's building inspector relative to his own qualifications.

 Plaintiff touches briefly on other sundry arguments, including defendant's failure to develop an identifiable standard for evaluating citizen satisfaction, the alleged addition of managerial

layers created by merging the code department with the housing and neighborhood services department and plaintiff's championing of and facilitating technological improvements within the office. These arguments are nothing but challenges to the wisdom of defendant's decision; not one provides any basis for inferring that defendant did not honestly believe that plaintiff's job duties were most easily divided and absorbed by other employees. Federal courts do not sit as super-personnel departments to reexamine the adequacy or correctness of an employer's hiring and firing decisions. *Gusewelle v. City of Wood River*, 374 F.3d 569, 576 (7th Cir. 2004); *Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir.2003). An employer has a right to make its own business decisions, even if those decisions are unwise; "regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, [courts] will not second-guess its decisions." *Green v. National Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir.1999).

Although a bona fide reduction in force "is not an open sesame to discrimination against a disabled person," *Matthews,* 128 F.3d at 1195, a disabled plaintiff cannot prevail under the indirect method of proof without some evidence that his employer's proffered legitimate explanation for its decision was a lie. Because plaintiff has not come forward with this type of evidence, defendant is entitled to summary judgment.

## ORDER

IT IS ORDERED that the motion for summary judgment filed by defendant City of Janesville is GRANTED as to plaintiff's claim that he was laid off because of his cystic fibrosis in violation of the Americans with Disabilities Act and the Rehabilitation Act. The clerk of court is directed to enter judgment for defendant and close this case.