In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2060

DANIEL L. FREDRICKSEN,

*Plaintiff-Appellant,*

*v.*

UNITED PARCEL SERVICE, CO.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 2285—**Virginia M. Kendall**, *Judge.*

ARGUED FEBRUARY 18, 2009—DECIDED SEPTEMBER 8, 2009

Before ROVNER, EVANS, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Daniel Fredricksen sued his employer, United Parcel Service ("UPS"), claiming that the company discriminated and retaliated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. The district court concluded that Fredricksen, who suffers from leukemia, had not set forth sufficient evidence from which a jury could conclude that he is "disabled" for purposes of the ADA or that he suffered an adverse employment action,

and the court therefore granted summary judgment for UPS on all claims. We affirm the judgment.

## I. BACKGROUND

Fredricksen began working for UPS in 1992 as an aircraft mechanic at the company's O'Hare Airport facility in Chicago, Illinois ("O'Hare gateway"). The events relevant to Fredricksen's claims occurred between early 2004 and May 2006, when he worked the afternoon shift at the O'Hare gateway. Although the parties differ about the precise duties of afternoon-shift mechanics, they agree that those mechanics are generally responsible for inspecting outbound aircraft and preparing them to depart on time. The terms and conditions of Fredricksen's employment were governed by a collective-bargaining agreement between UPS and the International Brotherhood of Teamsters Local 2727.

Fredricksen, who served as an elected union steward during this period, had a history of conflict with management. Although Scott Crane, one of Fredricksen's supervisors, had once commended his attention to detail as being comparable to that of a brain surgeon, the two men had a contentious relationship. Even before he was diagnosed with leukemia, Fredricksen had filed several internal grievances against Crane both for himself and on behalf of other mechanics at the O'Hare gateway. Several of Fredricksen's co-workers testified that working conditions at the gateway were tense across the board, and one recalled that there had "always been some friction" between management and "any one, if not all of us." Even after Fredricksen allegedly became disabled by his leuke-

mia, it was this general tension, not his illness, that Fredricksen cited when he lodged a complaint via UPS's employee hotline about the "hostile working environment" for all mechanics at the O'Hare gateway.

Fredricksen first learned that he might have leukemia in February 2004 when a blood test during a routine physical revealed signs of the disease. An official diagnosis—chronic lymphocytic leukemia—was not made until December 2004, and in March 2005 a specialist informed Fredricksen that his leukemia was in stage 0, the lowest-risk stage.

The parties disagree about when UPS management first became aware of Fredricksen's condition. During his deposition, Fredricksen testified that in May 2004, three months after his blood work first showed signs of cancer, he told Crane that he might have leukemia and that his doctor had advised him to avoid stressful situations. According to Fredricksen, Crane was sympathetic: he revealed that his previous wife had died of cancer and asked Fredricksen to let him know if there was anything he could do to help. Fredricksen also recalled that he told two other mechanics, Dave Horning and Paul Suchecki, about his possible leukemia around the same time. Fredricksen added that he shared the final diagnosis with Crane and supervisor Essey Kinfe in January 2005, the month after he received confirmation.

But other testimony submitted at summary judgment contradicts Fredricksen's version of events. Crane testified that he first learned of Fredricksen's illness from another mechanic in January 2005. Afterward, said Crane, he approached Fredricksen in the company break room,

acknowledged that he had heard about the diagnosis, and "wished him well." Kinfe similarly testified that he first learned about the condition in early 2005 when Crane told him that Fredricksen would be calling in late or taking days off for treatment of "some medical issues" and instructed Kinfe to "not hold that against him." Fredricksen's co-workers, Horning and Suchecki, also testified that Fredricksen did not tell them about his condition until early 2005. Fredricksen's interview with an investigator from the Equal Employment Opportunity Commission supports this version of events: he told the investigator that he had been diagnosed with leukemia in December 2004 and had first informed management in January 2005.

Fredricksen does not contend that anyone at UPS ever made any comment, discriminatory or otherwise, about his leukemia. Instead, he recites six workplace incidents beginning in May 2004 which he labels "a course of hostile, abusive, and harassing conduct because of his actual or perceived disability." First, in late May—just days after Fredricksen says he revealed the preliminary diagnosis to Crane—Crane reprimanded him for exceeding the prescribed requirements for inspecting outbound aircraft. Crane apparently believed that Fredricksen was performing excessively detailed inspections, and when Fredricksen used a magnifying glass to inspect cracks on an aircraft engine in June 2004, Crane reprimanded him again and then barred him indefinitely from inspecting the departing airplanes. From that point forward, Fredricksen testified, he was mostly "relegated to performing back room filing duties." He admitted, however, that he still performed maintenance jobs and certain

technical tasks when needed, and he did not deny the company's contention that he continued to perform all of his other job responsibilities including troubleshooting, replacing aircraft components, ordering parts, and fueling aircrafts. Fredricksen did not suffer any loss of pay as a result of the restriction.

Another alleged instance of harassment began on July 6, 2005, when Fredricksen and another mechanic were asked to work overtime on an engine test run, which they initially were told would take no more than two hours. As the expiration of the two hours approached, the men learned that the aircraft would not be ready for another four hours. Fredricksen, fatigued from the long day, clocked out 30 minutes later without first receiving permission. After a "fact-finding hearing," Fredricksen was placed on a "working suspension" for failing to work that evening as directed. As the name of the sanction suggests, Fredricksen continued to work during his "suspension" and did not suffer any loss of pay as a result.

The other four incidents were of similar character. On one occasion, Fredricksen was reprimanded for violating UPS policy by failing to sign an aircraft logbook, even though the mistake, according to Fredricksen and the other mechanics to testify, was a technicality frequently overlooked and seldom punished. Another time he was reprimanded and subjected to a "fact-finding hearing" when a technical publication he was charged with maintaining went missing, but the hearing did not result in any further discipline. On a third occasion, Fredricksen was involuntarily assigned to temporary duty in Lansing, Michigan. The brief temporary assign-

ment was authorized by Fredricksen's union contract with UPS. Fredricksen nonetheless viewed the incident as harassment because before assigning the position to him, UPS kept the assignment open to volunteers for only six days, instead of the seven days Fredricksen says the labor agreement required. And, finally, Fredricksen was directed to take a UPS recertification test without advance notice and then issued a written warning for not passing on the first attempt.

Fredricksen also sought two ADA accommodations during the two years at issue. First, although the labor agreement dictated that employees take "option" days—a type of vacation—in weekly blocks, Fredricksen wanted permission to take his days one at a time for medical reasons. When he submitted the request, UPS promptly sent him standardized forms for his physician to complete, but Fredricksen objected to the forms because he believed they requested excessive information and were intentionally drafted to disqualify employees from ADA protection. UPS declined to alter the forms, and when Fredricksen failed to return them, the company informed him that it considered his request withdrawn.

The other request was made in early April 2006, when Fredricksen asked to be reassigned to a vacant aircraft-mechanic position in Tucson, Arizona. Fredricksen explained in his request that he thought the weather in Tucson would make him less susceptible to catching colds or contracting pneumonia as a result of his leukemia. Under the labor agreement, Fredricksen could also compete for the post based on seniority, and he submitted

a bid. That bid was promptly accepted, and UPS thus informed him that it considered his accommodation request moot. Fredricksen started his new position in Tucson in May 2006, just after he filed this lawsuit at the end of April. At his deposition nine months later, Fredricksen reported that in Tucson he was allowed to perform aircraft inspections and had no complaints about management.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in favor of Fredricksen, the opposing party. *See Winsley v. Cook County*, 563 F.3d 598, 602 (7th Cir. 2009). We will affirm if the evidence at summary judgment establishes that there is no genuine issue of material fact and that UPS is entitled to judgment as a matter of law. *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 600 (7th Cir. 2009).

The ADA[1] prohibits discrimination against a "qualified individual with a disability because of the disability of

---

[1] Significant changes to the ADA took effect on January 1, 2009, after this appeal was filed. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Congress did not express its intent for these changes to apply retroactively, and so we look to the law in place prior to the amendments. *See Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 939-42 (D.C. Cir. 2009); *Winsley*, 563 F.3d at 600 n.1; *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009).

such individual." 42 U.S.C. § 12112(a) (2006). Though undoubtedly a serious medical condition, leukemia is not, per se, a "disability" for purposes of the ADA. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566-67 (1999) (explaining that determination of disability is based not on diagnosis of impairment but on effect of impairment); *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 642-43 (7th Cir. 2005) ("A medical condition . . . by itself does not constitute a disability under the statute."). Rather, an individual with leukemia, or any other illness, qualifies as "disabled" under the ADA only if (1) he has a physical or mental impairment that substantially limits one or more major life activities; (2) he has a record of such an impairment; or (3) his employer regards him as having such an impairment. *See* 42 U.S.C. § 12102(2); *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 781 (7th Cir. 2007). Fredricksen asserts that he is "disabled" under the first and third categories; thus to survive summary judgment he was required, as an initial matter, to present evidence from which a reasonable factfinder could conclude that he is substantially limited in a major life activity or that UPS regarded him as such.

We first consider whether Fredricksen presented sufficient evidence to demonstrate that he suffered from an actual impairment that substantially limited him in a major life activity. Although Fredricksen asserts in this court that he is substantially limited in breathing, walking, eating, speaking, and working, he developed only his arguments as to walking and breathing before

the district court, so any argument as to the other activities is waived.[2]

With regard to walking, Fredricksen testified at his deposition that since mid-2005 he has not been able to walk for "the same period of time or in the same way" as a "normal individual" because of muscle and joint fatigue caused by his leukemia. He did not elaborate, however, except to say that at times climbing one flight of stairs makes him feel as though he "just walked up the side of a mountain," that sometimes he gets tired just walking the aisles of a grocery store, and that he would not have the stamina to walk continuously from an airport drop-off point to a departure gate. And when asked if he could walk a mile, Fredricksen said only, "I don't know. I haven't tried." Fredricksen conceded, though, that at all times he was able to perform the essential functions of his job as an aircraft mechanic (which include walking, standing, bending, stooping, climbing, and crawling for the duration of an 8- or 10-hour workday), that he never missed work because of difficulty walking, that he never sought any type of assistive device or other treatment for the problem, and that no physician had ever directed him to restrict his walking. Dr. Kouchis, Fredricksen's personal physician and the only doctor to offer an opinion on the issue, testified that he did not believe Fredricksen's ability to walk was substantially

---

[2] Fredricksen also argued in the district court that he was substantially limited in the major life activity of procreating, but he has not raised that argument on appeal.

limited and could not remember Fredricksen ever giving any indication otherwise. Fredricksen sought to undermine Dr. Kouchis's testimony by pointing out that the doctor had treated him just three times and was not an expert on leukemia, but Fredricksen did not offer up any other medical opinion on his condition.

Fredricksen's testimony, which at summary judgment must be credited, makes clear that his leukemia-related fatigue impairs his ability to walk to some degree. But this testimony does not establish that the difficulties experienced by Fredricksen were sufficiently severe to rise to the level of a substantial limitation. To qualify as disabling, a limitation on the ability to walk must be "permanent or long term, and considerable compared to the walking most people do in their daily lives." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005). In *Sears*, for example, we held that a reasonable fact-finder could conclude that the plaintiff's neuropathy substantially limited her ability to walk because there was evidence that she could not walk the equivalent of one city block without losing sensation in her right leg and both feet, she walked with a cane and at times had to balance against a wall to avoid falling, and she was under a doctor's recommendation to avoid excessive walking. 417 F.3d at 793-94, 802. Moreover, the plaintiff presented evidence that within two years of the allegedly discriminatory acts her condition had deteriorated to the point that even walking distances as short as 20 feet was difficult, demonstrating the enduring nature of the limitation. *Id.* at 795, 802. In contrast, we have held that a plaintiff's testimony that she walks

"with difficulty," without any medical corroboration or evidence as to time or distance limitations, was insufficient to survive summary judgment, *Squibb*, 497 F.3d at 784-85, as was another plaintiff's evidence that he temporarily wore a protective boot for diabetic ulcers and experienced intermittent episodes of neuropathy, *Scheerer v. Potter*, 443 F.3d 916, 920 (7th Cir. 2006). With these benchmarks in mind, we simply cannot conclude that Fredricksen's evidence demonstrates anything more than a moderate limitation on walking. He did not present any medical evidence to corroborate his self-assessment of being substantially limited in the ability to walk (indeed, his own doctor disagreed with that assessment), nor did he present evidence as to the expected duration of his condition. Although Fredricksen may occasionally get winded when walking up stairs or grow tired while grocery shopping, he did not demonstrate that his ability to walk diverged significantly from that of the general population.

Fredricksen's contention that he presented sufficient evidence from which a factfinder could conclude that he was substantially limited in the major life activity of breathing suffers from the same failings. Fredricksen testified that, beginning in early 2005, he began to have difficulty breathing; he explained that because of his enlarged spleen—a symptom of leukemia, he says—he could not "get a full breath" and "under certain conditions" was unable "to sustain any exertion in the way that an average person would be able to." He opined that his trouble breathing is exacerbated by his chronic sinusitis (an inflammation of the sinuses and their linings), a

condition he says goes "hand in hand" with chronic lymphocytic leukemia. Fredricksen added that he takes a prescription asthma and allergy medication to ameliorate his breathing problems. His evidence on the subject ends there.

As with walking, we see no basis to conclude from this evidence that Fredricksen was substantially limited in the major life activity of breathing. Vague assertions of difficulty performing a major life activity do not create a genuine issue of material fact, particularly when unaccompanied by any evidence that the limitation is substantial compared to that of other adults. *See Burks v. Wis. DOT*, 464 F.3d 744, 756-57 (7th Cir. 2006). Fredricksen makes much of the fact that his sinusitis is "chronic" and therefore long-term, but he provided no evidence about the severity of the condition or its specific effects on his ability to breathe. Given the absence of any evidence showing that his difficulty breathing was substantial, the district court was correct to conclude that there was no genuine factual dispute on the issue. *See Scheerer*, 443 F.3d at 919.

Because Fredricksen did not present sufficient evidence that he was substantially limited in a major life activity, his only hope of meeting the statutory definition of a "qualified individual with a disability" was to demonstrate that UPS regarded him as disabled. To succeed on his "regarded as" claim, Fredricksen was required to demonstrate that UPS was aware of his leukemia and believed that the condition substantially limited him in a major life activity. *See Nese*, 405 F.3d at 643. Fredricksen con-

tends that UPS regarded him as substantially limited in the major life activity of working, but this argument fails for several reasons. Chief among them is that Fredricksen has never suggested that UPS perceived him as being unable to perform any job or tasks other than "the full range of . . . duties" of an aircraft mechanic. It is not enough that UPS—if Fredricksen is correct—thought that his leukemia prevented him from performing all of the duties of the job he held. To the contrary, Fredricksen could not demonstrate that UPS regarded him as substantially limited in the major life activity of working unless he had evidence that the company believed he was significantly restricted in the ability to perform a broad range of jobs. *See EEOC v. Schneider Nat'l, Inc.*, 481 F.3d 507, 511 (7th Cir. 2007); *Kupstas v. City of Greenwood*, 398 F.3d 609, 612-13 (7th Cir. 2005).

At all events, even if we assume that "aircraft mechanic" encompasses a broad range of jobs, *see Schneider*, 481 F.3d at 511 (assuming, without deciding, that "the entire spectrum of truck driving" might qualify as a broad range of jobs), Fredricksen in fact offered no evidence to support his speculation that UPS regarded him as substantially limited in the ability to work as an aircraft mechanic. Fredricksen first points out that shortly after revealing his preliminary diagnosis he was accused by Crane of overinspecting aircrafts and then barred from inspecting departing planes. Fredricksen says Crane's actions suggest that Crane sought to "undermine [him] and dismantle his responsibilities as a mechanic as soon as Crane was apprised of his leukemia." But Fredricksen has never explained how this evidence proves that

Crane regarded him as unable to work, and, if anything, it seems to demonstrate that Crane actually perceived him as performing unnecessary work beyond the scope of his mechanic duties. Fredricksen also contends that his various infractions were sanctioned disproportion-ately—a pattern of "harassment," he says—evidencing that UPS believed he no longer was able to perform the functions of his position. Again, however, he fails to explain how this discipline—which notably includes a "working suspension" for failing to work overtime as directed—reflects a misperception by UPS that he was substantially limited in his ability to work. A reasonable factfinder could not conclude on this record that UPS regarded Fredricksen as substantially limited in his ability to work.

Because Fredricksen failed to demonstrate that he had an impairment which substantially limited a major life activity or that UPS regarded him as having such an impairment, no reasonable factfinder could conclude that he was disabled for purposes of the ADA. Although this conclusion would not foreclose Fredricksen's re-taliation claim, his only mention of retaliation on appeal is a passing reference in the heading of his opening brief, and the claim is therefore waived. *See Mema v. Gonzales*, 474 F.3d 412, 421 (7th Cir. 2007). Our resolution of these issues makes it unnecessary to evaluate the district court's further conclusion that Fredricksen, dis-abled or not, failed to produce evidence that he suffered an adverse employment action that would be actionable under the ADA.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.